MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Theresa L. and Thomas J. ("T.J.") L. to their two children; Steven, now age ten and Kimberly, age seven. Steven was removed from his parents' home when he disclosed physical abuse by his father. Kimberly was removed a few days later as she was determined to be "at risk" by the Department of Children and Families, hereafter "DCF". On December 23, 1993, both children were adjudicated neglected and committed to the care and custody of DCF. Subsequent to the children's commitment, Steven and his older brother, Michael, also in foster care, disclosed repeated sexual abuse by their father and, at the very least, passive participation by their mother and their maternal grandmother. Both parents were arrested for risk of injury to a minor and sexual assault in the first degree. Both parents were incarcerated in connection with these charges at the time of trial before this court. On June 28, 1996 and July 23, 1996, DCF filed a petition for termination of parental rights as to Steven and Kimberly, respectively.
The court finds that the mother and father have appeared and have court appointed attorneys. The court has jurisdiction in this matter; there is no pending action affecting the custody of either Steven or Kimberly in any other court.
At trial, DCF proceeded against both parents on the grounds that the children had previously been adjudicated neglected and that each parent had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, such parent could assume a responsible position in the life of the children. Connecticut General Statutes § 17a-112
(c)(3)(B). Also alleged in the petitions are that the parents committed acts of omission and commission in violation of General Statutes § 17a-112 (c)(3)(C) in that the children have been CT Page 1681 denied the care, guidance, or control necessary for the children's physical, educational, moral or emotional well being. The last ground is available to the DCF when facts unknown at the time of the children's initial placement become known only after commitment, as is the case here concerning the sexual abuse charges. The allegations of abandonment as to the father and the ground of no ongoing parent-child relationship as to both parents were withdrawn, but the original adjudicatory dates were retained. As there had been an issue raised concerning the paternity of Steven and Kimberly, Thomas L. formally and in writing acknowledged his paternity of the two children, which acknowledgment the court accepted. At trial, both parents vigorously contested the allegations against them.
FACTS
A. The court, having read the verified petitions, the social studies, and the various documents entered into evidence, and having heard the testimony of various witnesses and evaluators over three days of trial as well as having taken judicial notice of the prior record in this court as to both children, makes the following factual findings and reasonable inferences supported by those facts:
1. Acts of Omission and Commission
On March 18, 1993, Steven, then age five, attended school with a swollen lip. The school contacted DCF, who determined that his father had pushed him into a washer and that his mother had intentionally kept him from school so that no one would find out about the incident. Steven reported that he was afraid of his mother and father as they would beat his "butt". An order of temporary custody was obtained and Steven placed in foster care. On March 26, 1993, an order of temporary custody was obtained for Kimberly, then age two and one-half, based on the extensive history of referrals in the family and the mother's failure to protect her children from physical abuse. Since 1981, there had been thirty-eight referrals concerning the family. Twenty-eight confirmed incidents included domestic violence, unsanitary living conditions and physical and emotional neglect of the children in the household. An older sibling, Michael R., had been removed from the home by DCF a few weeks earlier.
As a result of the disclosures, both parents were arrested and charged with assault and risk of injury to a minor. T.J. was CT Page 1682 incarcerated and remains incarcerated to this day. Teresa was placed on probation for three years. Shortly after his younger siblings were placed in foster care, Michael R. disclosed to his foster mother that he had been sodomized by his step-father, T.J. As a result of these new disclosures, both Steven and Kimberly were medically evaluated for abuse on April 27, 1993 at St. Francis Hospital. The results were inconclusive, neither confirming nor disproving that sexual abuse had occurred. By the end of that year, both Steven and Kimberly were adjudicated neglected on December 23, 1993 and committed to the care and custody of DCF.
On March 31, 1994, Steven acted out sexually in his foster home and reported, upon investigation, that while he was living with his parents, there were many times when T.J. would walk into the bathroom and stroke his penis while he was having a bath. Steven asked his father to stop and told his mother, whose only response was to tell T.J. to stop. The sexual abuse continued. He also said that his parents made him watch on TV "people doing nasty stuff like parents do to make babies."
Shortly thereafter on April 5, 1994, his older brother, Michael R. made further disclosures that he was fondled by T.J. in the bedroom and bathroom and that T.J. inserted his penis into Michael's buttocks many times. He stated that T.J. would put him down on the bathroom floor and sodomize him. "It hurt and first his penis was soft, then hard and then soft and my butt was wet and I would need to clean up again", he stated to Detective Wackerman who interviewed him. He said that one time his mother walked in while it was happening, told T.J. to stop and then walked out again. He also disclosed that he and his siblings were forced to watch pornographic movies of "men and women with no clothes on doing `it' and touching each other's private parts" in the living room while both parents were present.
In June of 1994, both Teresa and T.J. were charged with sexual assault in the first degree and further charges of risk of injury to a minor. But there were more disclosures yet to be made by the children. That fall in September of 1994, Steven reported that when he and Michael acted in public in ways which upset their parents, upon reaching home, they were made to get up on the kitchen table after their clothes were removed. Then both T.J. and Teresa would fondle his penis and "stick their finger in his butt." Teresa's mother, the children's maternal grandmother, would also be present but not take part. While Steven was on the CT Page 1683 table, Michael was seated next to the table, waiting for his turn. After the adults were finished with him, he went into the living room where he could hear Michael's screams. The kitchen table punishment happened hundreds of times, "morning and night", according to the child. The parents told him never to talk about this.
Several months later, Michael independently disclosed information about "the punishment" on the kitchen table described by Steven. He reported that his mother, step-father and grandmother would take off his clothes and make him get on the kitchen table. His mother and father would touch his penis and move it back and forth and turn him over and insert their fingers in his rectum. He said they also did this to Steven. He was concerned about parental reprisals and was worried about when his step-father was getting out of jail.
The Willimantic Juvenile Officer, Detective Wackerman testified to the care taken in the interviews with the children and in securing their written statements, which were exhibits before the court. He spoke of first inquiring whether the children knew the difference between the truth and a lie and then asking them if they knew the names of the body parts and then asking them open-ended questions about the material they were describing. He stated that he was familiar with this family, having arrested T.J. for the first time in 1991. He said that both children described sexually explicit material that they would not otherwise developmentally have been able to describe. He had no doubt that they were each recounting the traumatic events that happened to them while in their parents' care. Officer Beck, who took Steven's statement in the fall of 1994, recounted the similar steps she took with interviewing Steven. She, too, was utterly convinced of his truthfulness.
The parents, during their testimony before the court, denied the recurrent and regular sexual abuse described by their children. They, and in particular Teresa, believe that the children are lying, as they have lied about other things, although she admitted that T.J. physically abused the children and she did not stop him. Despite the denial of the parents and the beliefs they desperately cling to, the court finds the evidence concerning the repeated sexual abuse of the children overwhelmingly detailed and completely credible. By the clear and convincing evidence presented, the court concludes that Teresa and T.J. sexually abused both Steven and his older brother, CT Page 1684 Michael.
The evidence of any sexual abuse of Kimberly is not persuasive, however. Steven reported that Michael had told him about such abuse. Neither Michael nor Steven ever disclosed witnessing such abuse of their sister Kimberly was pre-verbal and could not describe such abuse. While, given the history of the family and the chaotic household, it is quite probable that Kimberly also suffered sexual abuse, the evidence is not clear and convincing. Her parents, and in particular T.J., did physically abuse this child and the court so finds from the clear and convincing evidence.
This family and the appalling acts which occurred within it exhibit the multi-generational pervasive and poisonous impact of neglect and abuse. T.J. was himself in foster care from the time he was eighteen months old. He was sexually abused, he reports, by his foster father, then his brother and later inmates at the various institutions in which he was confined. He did not complete high school and has only had marginal employment. He is illiterate and states he is borderline retarded and reports that he had seizures and blackouts. He reports a history of drug as well as alcohol abuse, including the use of cocaine, acid, speed, PCP, heroin as well as marijuana. He is a convicted felon with a lengthy history of involvement in the criminal justice system extending back to his adolescence, including convictions for breach of the peace, domestic violence, sexual assault and risk of injury to a minor.
Theresa, too, has suffered from severe parenting deficits. Her mother received social security disability assistance due to her mental retardation. Her father was an active alcoholic. One older sister was adopted by another family. There was domestic violence in the home. Teresa left home at age fifteen, pregnant with the first of her five children. She was herself placed in a foster home, where she would not remain. After the birth of her first child, she placed the child voluntarily in foster care after trying to care for the child for a few months. She never completed high school and describes herself as a "slow learner". Her employment history is non-existent, except for two short stints over ten years ago in fast food restaurants. She had various turbulent relationships with other men and had two other children by her first marriage to Roland R., the father of her second and third child, whom she divorced. She married T.J. in 1991. She admits to alcohol addiction, and there is evidence of CT Page 1685 her drug use.
2. Failure to Rehabilitate
T.J. has been incarcerated for over four years, the entire time his children have been in foster care. He has no contact with them, based on his conviction for sexually assaulting them and risk of injury charges stemming from the incident which led to the placement of the children and their subsequent disclosures. No expectations were set for him and no visitation provided, as a criminal protective order prohibited it.
At trial, T.J. admitted that he physically abused his wife. He denied physically or sexually abusing his children. He stated that he had done a lot of growing up while in jail and knows that he made mistakes in the past as a child and as an adult. He said "I don't look for trouble no more". He testified that he attended all the programs available to him in prison, NA, AA and Tier I and Tier II alcohol programs as well as schooling and self-esteem groups. He did not attend any programs for sexual offenders as there were none available in the facility in which he was housed.
He was evaluated by Dr. David M. Mantell, the court appointed psychologist in June of 1993. In his report of July 17, 1993, Dr. Mantell concludes:
 "He presents as a self-involved, concrete man with poor capacity for abstract reasoning and judgement. . . . His presentation and report indicate a chronic pattern of psychosocial dysfunction. . . His report and test results indicate serious emotional and personality problems, dependency problems, problems of judgement in addition to substance abuse problems, insufficient intellectual capacity and reported sexual victimization."
His recommendation at that time, prior to the detailed disclosures made by Steven and Michael, was bleak. "I do not anticipate any rehabilitative/remedial/educational steps that can enhance the father's parenting capacity."
In March of 1997, almost four years later, Dr. Mantell found T.J. less manic and in better control than during the last evaluation. He concluded that he suffered from "severe and CT Page 1686 chronic personality disorders, chronic substance abuse with antisocial features predominating." He saw little likelihood of long term rehabilitation.
For Teresa, the approach of DCF was different. Expectations were set for her in 1994 and until her incarceration in September of 1996, reunification with her children was the goal. She admitted herself that she did not meet all the DCF expectations; in particular to avoid further involvement with the criminal justice system and to complete sexual offender counseling and treatment, which was also a condition of her probation, after her convictions for risk of injury. In addition to the sexual assault charges in 1994, she was arrested for breach of the peace. But most damaging, she admitted during her testimony that until her incarceration in 1996, she thought it was all a game and did not take the counseling seriously. As of September 1996, she had not even begun to consider what she needed to do to rehabilitate herself, even though she had attended AA, NA and all of the other programs to which the DCF had referred her.
On three separate occasions prior to her incarceration, she was admitted into and then discharged from sexual offender treatment at Northeast Clinical Associates. Linda Zaccaro, a clinical psychologist, testified that Teresa on the second such referral had begun to discuss flashbacks she experienced during which she could recall some of the incidents in the home and the kitchen table punishment of Steven and Michael. Afterwards, however, Teresa denied her beginning awareness of her own culpability for the children's sexual abuse. In 1997, she stated to Dr. Mantell that it was likely that T.J. sexually abused her children, but denied that she took any part in it. She did then and now does admit to not being able to protect any of her children from T.J.'s physical abuse.
Dr. Fitzgibbons, a clinical psychologist working at York Correctional Center, testified to Teresa's participation in a counseling program which included a component for sexual offenders. He had not reviewed any prior evaluations or information concerning Teresa and all information he had about her came from her directly. He testified that during the year-long course Teresa became less angry, more cooperative and more willing to examine herself. "These were not giant steps", he said, "but some observable progress was made". He testified that she participated actively in the group sessions. He also stated that she would require further treatment before she could be CT Page 1687 reasonably functional in the outside community and before she could parent any children. While he could not state any definite time for such treatment, given his experience, it would not be a brief intervention.
None of the court appointed evaluators believed that Teresa had rehabilitated to the point where she could parent her children. Dr. Mantell found in 1993 that Teresa's parental record was miserable. He saw no point in nurturing a connection between the parents and the children through an active visitation schedule if the parents are doing nothing to improve their abilities, which at no point since that time either of them have ever done. In April of 1997, this evaluator concluded Teresa suffered from "severe and chronic personality disorders" and saw little likelihood of long term rehabilitation.
The court concludes from the clear and convincing evidence that as of the dates of the filing of the termination petitions in 1996, neither parent had rehabilitated to the point that either parent could be expected to parent the children. Their continued incarceration prevents both from being physically able to care for their children.
3. The Children
Both Steven and Kimberly have been evaluated on numerous occasions. The results of the evaluations and testing only further demonstrate the extraordinary deprivation and abuse they experienced within their family of origin. And even four years after their removal from this home, the children continue to exhibit the consequence of such gross parenting failures. Their prognosis for recovery and becoming healthy functioning children, let alone adults, is guarded at best.
A. Steven
Dr. Mantell, the court appointed psychologist, evaluated both Steven and Kimberly for the first time in July of 1993. At that time, based on the foster mother's report, he concluded:
 "Steven arrived as an especially aggressive, under-socialized and emotionally disturbed child. . . . . he has a lack of conscience for his actions, will take his pain out on his sister, needs to be watched closely and does not follow CT Page 1688 simple direction."
At the foster home, there were times when Steven showed sexualized behaviors, grabbing the older boys genitals and kissing other school children on the mouth. Dr. Richard Sadler, the court appointed psychiatrist, found in January of 1994:
 "Steven L. is an attractive, intelligent, interpersonally related child who gives every indication of having been massively neglected and abused over many years. Steven appears to be a child who has been extraordinarily traumatized by his exceedingly deviant parents who have allowed the physical and emotional, and, perhaps, sexual abuse to go on without intervention. Cigarette burns on Steven's body indicated that he has been intentionally tortured. His touching the genitals of his foster siblings and kissing schoolmates on the lips suggests at least exposure to inappropriate sexual material by this child."
Steven's behaviors continued without much improvement as described and in June of 1994, he was psychiatrically hospitalized at Elmcrest Hospital. The staff found that his progress was seriously compromised by the re-initiation of visits with his mother and her inclusion in his therapy. After her renewed involvement, Steven began to exhibit increased anxiety and resisted discussing his past abuse. The staff reported that within a few days of such visitation, "his behavior had deteriorated to the point of assaulting and attempting to assault staff and peers by throwing heavy objects at them." He required a second hospitalization and the staff urged a moratorium on his visits with his mother. They stated:
 "Steven's mother seems less concerned about her son's well-being and progress in treatment and more concerned about-exonerating herself in Steven's eyes and in reclaiming her rightful property. . . she continues to minimize the extent of her responsibility for the incidents which resulted in Steven's removal from her home."
In January of 1995, Steven was hospitalized at Elmcrest again. At that time, he was diagnosed as suffering from Psychotic Disorder, Post Traumatic Stress Disorder, Dysthymia and Impulse CT Page 1689 Control Disorder. It was found that he was then
 "exhibiting a severe dissociative disorder. He has been able to verbalize awareness of four alter personalties. . . Steven claims he has no control of these different personalities and that they are responsible for many of his assaultive behaviors; i.e. attempting to strangle his sister and drown his foster brother. Changes in Steven's personality and increased disassociative behaviors have been clearly observable in both the program and at home."
At that time, he began to receive psychotropic medication to assist him. Despite his extraordinary difficulties, Steven was then in second grade and performing work that was above grade level
Just a month later, in February of 1995, Dr. Sadler again evaluated this child. His conclusions did not alter from those reported in 1994:
 "Steven is a traumatized child who shows developmental delays and serious psychiatric symptoms. . . . . He would be expected to require unusually competent foster care in a setting familiar with and comfortable with emotionally traumatized children. Steven's emotional intensity and interpersonal difficulties require extraordinary focus of attention and close supervision. The emotional difficulties resulting from the emotional neglects and traumas experienced will require an unusually deft emotional touch in dealing with this pleasant, but also exceedingly intense and emotionally troubled and intermittently aggressive child."
There is no question that the foster home in which he was placed continued to provide Steven with the care he needed. Nonetheless, his aggressive and assaultive behaviors continued. He was abusive towards animals at the foster home and killed a goat there in 1996. He attempted to drown a foster brother and continued to assault his sister. He suffered from sleep abnormalities and once, arose at night and with a pair of scissors, cut his foster mother's hair while she was sleeping. CT Page 1690 While the family instituted new safety measures, problems continued.
Steven also received intensive individual counseling to help him cope with and unlearn some of his behaviors. At trial, the clinical psychologist who has been treating Steven individually on a weekly basis since 1996, Dr. Barbara Bunk, testified that Steven's behavior patterns were very entrenched and extraordinarily difficult to change. She said: "Since 1995 Steven has been in treatment with others and in partial hospitalization programs and very little seems to have been maintained". She stated that "he can carry on a conversation and say he feels sad about what he did, but does not seem to be able to maintain that outside of adult supervision." She was unequivocal that there should be no contact with his parents.
At trial, for the first time Dr. Bunk gave her opinion as to this child's placement, with sadness, she stated Steven needs to be placed in a residential treatment center. There he can have twenty-four hour a day supervision and intervention to help him to behave in more socially appropriate ways and to handle his intense feelings. She believed that at such a long term residential center, he would be able to learn to live with a family and in society to ultimately be able to return to his foster home. She saw them as a viable family setting. She stated that Steven is more attached to his foster mother than anyone else with whom he interacted and he had spoken of his special relationship to his foster mother during their many sessions.
She spoke of his lack of a relationship with his father and mother. Steven sometimes told her the reason he had so much anger inside him is that he had been hurt by both his parents. She said it would be difficult, if not impossible, for him to understand how to have a relationship with his parents.
B. Kimberly
Kimberly was two and a half years old when she was placed in foster care. When she was seen by Dr. Mantell in July of 1993, he found that she had serious emotional, behavioral and developmental delays. When first placed, the foster mother reported that the child showed a lack of emotion, that she had a hard time walking, talking and feeding herself. She was non-verbal and then began to talk openly. Her motor coordination was clumsy. Initially she was aversive to men and progressed to CT Page 1691 being neutral. She engaged in inappropriate actions including straddling the foster father's crotch and rocking up and down and back and forth and laying on the bed with her legs up and moving her hips up and down. She has been observed to straddle dolls and she would then scream to her foster mother to "get out." She had persistent nightmares and she slept most successfully on the floor. She was combative, hitting, biting and pushing.
Dr. Sadler saw Kimberly a year later, in July of 1994. He found that she "showed the effects of extreme social, physical and emotional deprivation at the time of her foster care placement". Despite her progress, at that time she continued to show evidence of "extreme emotional distress and serious emotional disorder and a wide range of important and non-transient social/emotional distortions of development." At that time, he found that "the continuing contact with the children's abusive and neglectful mother is an additional stress and de-stabilizing factor." He recommended additional support services to the foster family to cope with two such emotionally disturbed children.
In February of 1995, Dr. Sadler once again evaluated Steven, Kimberly and their mother. At that time he found:
 "Kimberly L. is a seriously psychiatrically impaired child who has been multiply traumatized while living in her parent's home . . . Her development continues to be delayed socially, emotionally and intellectually. Kimberly shows massive impairments in her social relatedness indicating the degree to which she has not been able to recover from the abuse and neglects and disordered interpersonal relationships she experienced within her family's home. Kimberly shows the symptoms of Post Traumatic Stress Disorder as well as a Reactive Attachment Disorder."
Both conditions he found were major impairments to Kimberly's functional abilities. "Kimberly will be expected to need intensive individual psychotherapy as well as group and family interventions for many months, if not years", he concluded.
A year later in March of 1996, he again evaluated Teresa and observed Teresa and Kimberly together. At that time, he found CT Page 1692 mother and daughter to interact conventionally. He stated:
 "In my opinion, Kimberly's expressed desire to see her mother and her statement she loves her mother are weightless. Ms. L.s' professed love for her daughter in my opinion are without substance and is an expressed emotion which had resulted from no behavioral manifestation from Ms. L. Ms. L. is a convicted child abuser who is unrepentant, uneducated and uninformed regrading the nature of her abuses of her children."
He found that she had not demonstrated even a hint of an ability to correct the personality factors which contributed to the abuse of her children. Further, she had taken no steps to rehabilitate herself. At that time and at the time of trial, he concluded the best interest of the child would be served by a speedy termination of her mother's parental rights and the child's placement in the most stable, emotionally connected and responsible family that could be found for her.
By 1997, Kimberly had made some progress, but there were still significant concerns about her ability to function. A full comprehensive and multi-disciplinary PEDAL evaluation was undertaken at Connecticut Children's Medical Center. Among other concerns were the determination of any neurologic impairment and/or the presence of Fetal Alcohol Syndrome. Kimberly has a heart murmur that was diagnosed when she was eighteen months old and then surgically corrected while she was in foster care. At age six, she was still wetting and soiling herself and exhibiting eating disorders. She continued to be clumsy and had blackouts which caused her to fall on the floor. By January of 1997, she was in the first grade, a special education student with a one-on-one paraprofessional working with her.
The results of the testing at the Medical Center raised numerous and pervasive concerns. Kimberly's intelligence test shows her to be in the low average range. There are, it was reported by the team,
 "apparent features of fetal exposure to drugs and/or alcohol that have most likely contributed to an overall neurologically based developmental disorder. . . . The presence of this kind of disorder means that Kimberly has difficulty CT Page 1693 processing environmental information, organizing that information and then responding with coherent behavioral output."
Further, the team found Kimberly to be:
 "displaying features of chronic depression. As the child became more aware of these depressive states passive suicide ideation has emerged. Kimberly's early history of trauma exposure and apparent lack of attachment formation is significantly interfering with her ability to develop a cohesive sense of self. There is evidence that she is making use of disassociation as a defense mechanism."
At the conclusion of all testing recommended for Kimberly, the team found:
 "We have serious concern about Kimberly's mental health status. She presents symptoms consistent with Reactive Attachment Disorder of early childhood with Dissociative Identity Disorder. . . . For Kimberly, the combination of neurologically based compromises and reactive attachment disorder is extremely concerning as it impacts many areas of everyday life experience, including learning, recreation, communication, interpersonal relationships and behavioral organization."
The team recommended a significant and multi-faceted course of treatment for the child.
At trial, the clinical psychologist treating Kimberly, Dr. Lertoura, testified. She has been working with Kimberly since 1996 and has witnessed at first hand symptoms of the diagnoses during her weekly sessions with this child. She had no question but that termination was warranted for this child and that no future contact with her parents should be permitted. She stated that whenever mention of her biological family was made, Kimberly decompensates rapidly and exhibits intense fears of her family. She rolls herself up into a fetal position or acts out to ensure that any discussion of her family will end, as such discussion is emotionally intolerable to her. Dr. Letoura characterized Kimberly as a psychologically fragile child. Nonetheless, despite CT Page 1694 the abuse her brother, Steven, has occasionally inflicted upon her, she is connected to him and continues to live with the same foster family.
4. DCF Responsibility
DCF bears some responsibility for its failure to protect these children in what was clearly known by them to be an extraordinarily high risk environment. While there is tension between the goal of reunification of parents with their children and necessary state action to protect such children, in this case, protection should have become the primary goal far more quickly. Since 1981, DCF had been involved with this mother and her children. There had been twenty-eight confirmed referrals by 1993. The family was also notorious with the local police as both parents had been arrested for domestic violence. If ever there were reasons to act to intervene quickly and decisively early in the lives of these children, these facts should have provided the impetus for such action. While the sexual abuse allegation had not then surfaced, the chaotic living conditions, physical abuse, domestic violence and neglect of the children were visible and impossible for the trained; observer to overlook.
To compound its failure to act to protect the children earlier, DCF pursued a goal of reunifying these children with their mother for an additional three years, until her incarceration in September of 1996. How such goals could have remained in place, given the reports of the court appointed evaluators, Dr. David Mantell, the clinical psychologist, and Dr. Richard Sadler, the child psychiatrist, is beyond comprehension. Their detailed reports describe in strong language the multiple traumas the children suffered. Both experts are experienced evaluators and know the population served by the DCF. Neither lightly uses the words "exceedingly dysfunctional" and "extreme difficulties" and their reports are full of such adjectives. Yet their warnings were not heeded in the planning for these children until years after their reports were rendered.
Six months after the removal of the children, Dr. Mantell reported:
 "The allegations are that both parents have used excessive force with the children. Such a result is probable since both parents are so incompetent, inconsistent, self-involved, and the children's CT Page 1695 behavior has been so difficult and challenging."
He found that supervised visitation should be kept at a minimum. He further stated that "parental claims of rehabilitation should not be accepted as a substitute for professional documentation." Such documentation was never to be forthcoming in the case of either parent.
Dr. Sadler, in reviewing Dr. Mantell's report of the behaviors observed and chronicled, while conducting his own evaluation in January of 1994, stated:
 "I do not understand the reasons for continued visitation between Steven and his mother who was known to participate in his abuse over long periods of time without acknowledging the abuse or contributing to Steven's treatment. In my opinion, this constitutes a separate and continuing trauma to Steven (emphasis added) and would be expected to interfere with his ability to form an appropriate and nurturing attachment to his current foster family."
Dr. Sadler did not evaluate Kimberly at that time, but the same consequences of continued visitation could be expected for her as well.
In July of 1994, Dr. Sadler was hopeful that Ms. L. could rehabilitate herself, but was sanguine about the likelihood of such a result, based on her past history. Nonetheless, he recommended that visitation be closely monitored. Each visitation period should continue only so long as Teresa was able to focus on the emotional and physical needs of her child, as it was apparent to him that she focused on her own needs and was inattentive to Kimberly. By February of 1995, Dr. Sadler had again interviewed the children, including Michael R., and reviewed anew Dr. Mantell's earlier report. He stated "My reading of Dr. Mantell's report suggested little hope of an eventual rehabilitation of this family where no member had everexperienced appropriate structure or nurturing from a caringadult." (emphasis added). By March of 1996, he was unequivocal about recommending a speedy termination of parental rights.
5. Present Circumstances
CT Page 1696
Both children now exhibit the consequences of the pernicious cycle of abuse and neglect which began at least a generation earlier in this family. Such consequences are still painfully visible, even though they have not lived with their family of origin for four years. The failure of the DCF to intervene decisively and early in their dysfunctional and abusive family compounded the abuse they suffered. Their difficult lives show the consequences of a child protection agency making "efforts to keep all families together no matter what their history . . ., compromising the safety of many children." Gelles, The Book ofDavid, the Failure of Family Preservation, Basic Books, 143 (1996). In Kimberly's case, such abuse reaches back into the womb, when her mother's alcohol and drug abuse caused the neurological damage that now manifests itself in the fetal alcohol effects discernible in her. Her other behaviors point to serious emotional and physical deprivation while she was with her parents as well as physical, and possibly sexual abuse. Steven's aggressive behaviors, lack of empathy and conscience regarding his impact on others, his cruelty to animals and his inability, despite significant therapeutic input, to modulate those behaviors show the indelible persistence of pernicious neglect and abuse. This bodes ominously for his future.
Steven and Kimberly already act towards others in physically aggressive ways. The lack of attachment and parenting they endured are seen as sources of violence in our increasingly violent society. "When we look closely at the families of violent children across classes and racial difference, we find an impoverishment of human connectedness, trust, support and emotional nurturing. . . . There is a sense of separateness; a chronic irritability; an absence of optimism, joy and knowing how to laugh; and a need to numb against hopelessness." Karr-Morseand Wiley, GHOSTS FROM THE NURSERY, The Atlantic Monthly Press, New York, 271, (1997) While predictions of the future are not the court's province, there is no doubt that both children are at enormous risk to harm others and to be harmed themselves.
ADJUDICATION
The court finds by clear and convincing evidence that both Teresa L. and T.J. L. have committed acts of omission and commission in violation of General Statutes § 17a-112
(c)(3)(C) in that the children have been denied the care, guidance, or control necessary for the children's physical, educational, moral or emotional well being. Further, both Steven CT Page 1697 and Kimberly have been adjudicated neglected. As previously found, both parents have failed to achieve such a degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the children, such parents could assume a responsible position in the life of the children. Connecticut General Statutes § 17a-112
(c)(3)(B). The court further finds that both grounds had existed for more than one year prior to the filing of the termination petitions.
REQUIRED FINDINGS
The court makes the following factual findings required by § 17a-112 (e):
1) Appropriate and timely services were provided by the Department of Children and Families, including counseling, transportation assistance, visitation coordination, a parent aide, parenting classes, alcohol and drug counseling and sexual offender counseling. In the father's case, by court order there was no contact with the children and no services offered. And as is demonstrated by the evidence, he would not have benefited from any such services as he has never acknowledged the abuse he inflicted on his children. Teresa received many extensive services, from which she did not benefit.
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. As previously stated, the court finds that DCF continued to pursue this goal with Teresa, long after it was clear that it was not in the best interests of the children to do so.
3) DCF, with the approval of the Court, set reasonable and realistic expectations and service agreements in order to reunify the family. None were set for the father, due to his incarceration and the nature of his crimes. The expectations set for Teresa G. were both reasonable and realistic.
4) The children have strong emotional ties with the foster family who have provided the highly specialized physical, emotional and educational support these multiply traumatized children need. The testimony indicates that Steven requires residential placement. Kimberly needs a panoply of services and supports to keep her functional. The therapists have testified that the children each CT Page 1698 have only negative memories of their biological parents.
5) Finding regarding the age of the children. Steven is ten and Kimberly seven years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. The father has taken programs available to him while incarcerated, but, given his denial of his actions, has done nothing to adjust his circumstances while incarcerated to make it in the best interests of the children to be returned to him.
Teresa made more efforts than her husband, although unavailing. She, too, has not begun to comprehend the magnitude of her parenting failures. She has not yet addressed the issues which led to the removal of her children including her failure to protect her children. While her contact with Kimberly until 1995 was sustained and she had regular visitation, the evidence is overwhelming that she cannot rehabilitate herself and it is not in these children's best interest to be returned to her home.
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. No inappropriate conduct is noted. It is the criminal behavior of both parents which removed them from their children's lives. DCF has taken many steps to encourage the mother to have a meaningful relationship with her children and to rehabilitate herself, which she has been unable to accomplish.
DISPOSITION
The court finds, based upon the testimony and evidence presented, that it is in Steven and Kimberly's best interests to terminate the parental rights of Teresa L. and T.J. L. to them. These findings are made after considering these children's highly specialized needs, the length of time they have been separated from their family of origin, their need for a secure and permanent environment. the relationship that they have with their CT Page 1699 foster parents, and the totality of circumstances surrounding their short and eventful lives. This court is aware of the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 776, 455 A.2d 1313 (1983). The Appellate Court has also noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." Inre Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET. AL., BEYOND THE BEST INTERESTSOF THE CHILD 99 (1979). For these two children, too much time has already been taken up in waiting for the impossible to happen and they have languished in temporary placement for more than four years.
Based upon the foregoing findings, the court determines that it is in Steven and Kimberly's best interests for a termination of parental rights to enter with respect to the biological parents, Teresa and Thomas J. L., and it is ORDERED that the parental rights of Teresa and Thomas J. L. are terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. A permanency plan for both children shall be submitted within ninety days. A review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session.